NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**JOHN LARRY SANDERS AND
SPECIALTY FERTILIZER PRODUCTS, LLC,**
*Plaintiffs-Appellants,*

v.

**THE MOSAIC COMPANY, CARGILL, INC.,
AND CARGILL FERTILIZER, INC.,**
*Defendants-Appellees.*

---

2010-1418

---

Appeal from the United States District Court for the Western District of Missouri in Case No. 09-CV-0016, Magistrate Judge John T. Maughmer.

---

Decided: April 20, 2011

---

JOHN M. COLLINS, Hovey Williams LLP, of Overland Park, Kansas, argued for plaintiffs-appellants. With him on the brief were SCOTT R. BROWN and MATTHEW B. WALTERS.

PETER M. LANCASTER, Dorsey & Whitney LLP, of Minneapolis, Minnesota, argued for defendants-appellees.

With him on the brief were DEVAN V. PADMANABHAN and HEATHER D. REDMOND. Of counsel was J. DAVID WHARTON, Stinson Morrison Hecker LLP, of Kansas City, Missouri.

———————————

Before PROST, SCHALL, and MOORE, *Circuit Judges.*

MOORE, *Circuit Judge.*

John Larry Sanders and Specialty Fertilizer Products, LLC (Sanders) appeal a stipulated judgment of noninfringement of United States Patent No. 6,210,459 ('459 patent) by The Mosaic Company, Cargill, Inc., and Cargill Fertilizer, Inc. (collectively Mosaic). Because the district court incorrectly construed the claims of the '459 patent, we *vacate and remand* for further proceedings. Because Mosaic's pleadings were sufficient to allege a case of inequitable conduct, we hold that the trial court did not err by allowing Mosaic to amend its complaint to add a counterclaim of inequitable conduct.

## BACKGROUND

This appeal comes in a suit brought by Sanders accusing Mosaic of infringing various claims of the '459 patent. The '459 patent is a continuation of United States patent application 09/162,103, which issued as United States Patent No. 6,132,485 (parent patent). The '459 patent is generally directed to soil nutrient compositions and methods of using those soil nutrient compositions.

During the litigation between Sanders and Mosaic, the parties stipulated that the terms "soil nutrient composition" and "composite comprising a self-sustaining body" should be construed in the same way. The district court considered these claim terms within the language of the claims, namely "soil nutrient composition compris-

ing . . . a micronutrient" and "composite comprising . . . a micronutrient." In a claim construction order dated May 17, 2010, the court held that these terms meant "high-concentration micronutrient compositions and composites." The court further refined this construction based on testimony from the parties' experts, and held that "the patentee disclaimed and disavowed micronutrient percentages lower than about five percent" during prosecution of the parent patent.

The court also construed the same two terms, "soil nutrient composition" and "composite comprising a self-sustaining body," as "limited to non-stratified homogenous products." Again, the court held that the patentee "disavowed fertilizer structures that were not non-stratified homogenous products" based on a disclaimer in the parent patent prosecution. The court also found that "the process described in the '459 patent would result in a non-stratified, homogenous product," which further "corroborate[d] the conclusion that the disclaimers . . . made by the patentee in connection with the '485 parent patent are also applicable to the patent-in-suit."

Subsequently, the district court granted Mosaic leave to amend its pleadings to include a declaratory judgment counterclaim of unenforceability due to inequitable conduct. The court considered the standard we articulated in *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312 (Fed. Cir. 2009), which requires an inequitable conduct pleading to meet the standard of Federal Rule of Civil Procedure 9(b). After analyzing Mosaic's pleadings, the court noted that "the question of futility is somewhat close," but nevertheless granted leave to amend since the pleadings adequately set forth the "who, what, when, where, and how" of the alleged inequitable conduct.

The parties stipulated to noninfringement under the court's claim construction. The district court entered a final judgment on June 11, 2010. Sanders appeals. We have jurisdiction pursuant to 28 U.S.C. §1295(a)(1).

DISCUSSION

I

We construe a patent claim according to the plain meaning of its terms to one of ordinary skill in the relevant art. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). A patentee, however, may diverge from the plain meaning of a term by acting as its own lexicographer. *Id.* at 1316. A patentee can also narrow the meaning of a claim term through prosecution, for example by distinguishing a claim from a piece of prior art. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323-26 (Fed. Cir. 2003). Any disclaimer, however, must be clear and unmistakable. *Id.* at 1325-26.

The district court held that Sanders disclaimed everything except high-nutrient compositions in order to distinguish United States Patent No. 5,571,303 (Bexton). The first disclaimer cited by the court occurred during prosecution of the parent patent. During prosecution, Sanders submitted proposed amended claims to the examiner for discussion at an examiner interview. At the interview, the examiner cited Bexton for the first time, as the nearest prior art. Sanders sought to distinguish Bexton by adding a high-concentration limitation, "said amount of micronutrient being a majority of the composition on a weight basis." Sanders argued that Bexton no longer reads on the claims (in the parent) because Bexton does not suggest "a high-concentration product as presently claimed," it only discloses "a minor amount of trace element, less than 5% by weight." J.A. 264.

The claims in suit, however, are distinct from the claims of the parent patent. For one, the claims in suit do not include the high-concentration limitation—that micronutrients make up "a majority of the composition." The claims in suit also differ from the parent claims because they include a limitation that "the amount of ammonium sulfate . . . [is] greater than the amount of elemental sulfur . . . on a weight basis." *See, e.g.*, '459 patent claim 1.

Mosaic argues that despite the differences between the parent claims and the '459 claims, the '459 claims are also limited to high-concentration micronutrient. Mosaic argues that during the prosecution of the application that became the '459 patent Sanders disclaimed anything but high-concentration micronutrient. In remarks submitted with a preliminary amendment, the applicant explained: "The present invention is concerned with high-concentration micronutrient compositions and composites . . . ." J.A. 147. Mosaic asserts that this statement justifies reading the "high-concentration micronutrient" limitation into the claims because the applicant unreservedly characterized the invention as a whole. We do not agree that this introductory sentence amounts to a clear and unmistakable disclaimer.

The applicant goes on to explain the invention in great detail over the next half-dozen pages. J.A. 147-54. Of particular significance is the fact that Sanders discusses specific groups of claims, and explains how each is distinguished from the relevant prior art references, including Bexton. Sanders explains that the claims at issue are distinguished from the prior art, including Bexton, because "the amount of ammonium sulfate . . . [in the composition is] greater than the amount of elemental sulfur . . . on a weight basis." J.A. 148-49. This distinction is consistent with the plain language of the claim,

which includes no limitation on the amount of micronutrient present in the composition. In contrast, in the same remarks, Sanders went on to distinguish a different group of claims in the '459 patent, not at issue, from Bexton based on the amount of micronutrient; these claims are expressly limited to "4.62% to about 74% by weight" of micronutrient. J.A. 150-53. Sanders' argument with respect to this discrete group of claims further underscores that he did not intend to generally distinguish his invention from Bexton based on the micronutrient concentration, notwithstanding the introductory sentence characterizing "[t]he present invention." Considering the entirety of the remarks, we conclude that Sanders has not clearly and unambiguously limited the claims at issue to high-concentration compositions.

Neither the arguments during prosecution of the '459 patent nor the comments and amendments in the parent prosecution clearly and unambiguously limit the scope of the claims at issue. As a result, we conclude that prosecution disclaimer does not limit the claims at issue to high-concentration micronutrient compositions.

The trial court also limited the claims at issue to "non-stratified homogenous products" based on (1) statements made in the parent prosecution and (2) the trial court's understanding that the process described in the '459 patent specification would result in a non-stratified homogenous product. During the parent prosecution, Sanders characterized a prior art reference as describing "a stratified, non-homogenous fertilizer product" in an examiner interview. J.A. 264. At the time, some of Sanders's proposed claims were expressly limited to a "composition comprising a substantially homogenious [sic] mixture" of ingredients, which distinguished them from the prior art. J.A. 257. The claims at issue, however, are not limited to homogenous mixtures. Likewise, the speci-

fication does not indicate that the invention is limited solely to homogenous mixtures.  As a result, we hold that Sanders did not clearly disclaim soil compositions other than non-stratified homogenous products.

Turning now to the construction of the terms at issue, the parties agreed that "soil nutrient composition" and a "composite comprising a self-sustaining body," both "comprising . . . a micronutrient," should be construed the same way.  Because we find the specification, prosecution history, and language of the claims do not limit these terms solely to high-concentration micronutrient compositions, and do not exclude compositions other than non-stratified homogenous products, we decline to read those limitations into the plain language of the claim.  Instead, "comprising . . . a micronutrient" should be given its plain meaning, which is "including, but not limited to, . . . a micronutrient."  *See CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007) ("In the patent claim context the term 'comprising' is well understood to mean 'including but not limited to.'").

The parties also contest the construction of the term "mixture."  The trial court construed mixture as part of a larger phrase:  "composite comprising a self-sustaining body formed of a mixture comprising ammonium sulfate, elemental sulfur, and a micronutrient selected from" a group of micronutrients.  The court held that "mixture" within this phrase meant "a mixture of those listed elements:  ammonium sulfate, elemental sulfur, and at least one micronutrient."  Thus, it appears the court construed "mixture" to mean "a mixture."  We agree that "mixture" does not require any additional construction.  We note, however, that the phrase construed by the trial court is actually "a mixture comprising" various ingredients. While the claimed mixture must include the listed ingredients, it is not limited to them, and may optionally

include other components in addition to those explicitly recited. *CIAS*, 504 F.3d at 1360-61.

## II

Sanders also appeals the district court's grant of Mosaic's motion for leave to amend its pleadings to add allegations of inequitable conduct. A motion to amend a pleading is a procedural matter governed by the law of the regional circuit. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1318 (Fed. Cir. 2009). "Whether inequitable conduct has been pleaded with particularity under Rule 9(b) is a question governed by Federal Circuit law." *Id.* To plead inequitable conduct, "the pleading must identify the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Id.* at 1328. At the pleading stage the proponent of the inequitable conduct theory need only plead facts supporting a reasonable inference that a specific individual knew of the misrepresentation and had the specific intent to deceive the PTO. *Id.* at 1328-29. "A reasonable inference is one that is plausible and that flows logically from the facts alleged . . . ." *Id.* at 1329 n.5.

The court below conducted a thorough analysis of Mosaic's amended pleadings in light of the standard we set forth in *Exergen*. Although the court specifically noted that "it remains to be seen whether the inequitable conduct claim . . . will survive a motion for summary judgment," it concluded that Mosaic alleged facts sufficient to meet the pleading standard. We agree.

Sanders argues that the amended pleading does not include any allegations of knowledge or specific intent to deceive, and is futile in any case. Mosaic's amended counterclaims, however, plead facts from which the court could reasonably infer both knowledge and intent to

deceive the Patent Office. For example, Mosaic's Second Amended Counterclaim alleges that Sanders filed a continuation application and included an expert declaration from Dr. Larry S. Murphy that was written in significant part by an employee of co-plaintiff Specialty Fertilizers. Mosaic also alleges that Sanders failed to disclose Dr. Murphy's business relationship with Sanders and his company, and that Dr. Murphy omitted publications that he co-authored with Sanders on the curriculum vitae submitted to the Patent Office. Mosaic further alleges that the failure to disclose the relationship between Dr. Murphy and Sanders was intentional and material.

Our cases indicate that the failure to disclose an expert's affiliation with the applicant to the Patent Office can constitute inequitable conduct. *See, e.g.*, *Refac Int'l, Ltd. v. Lotus Dev. Corp.*, 81 F.3d 1576, 1584-85 (Fed. Cir. 1996). It is a plausible inference, flowing logically from the facts alleged, that the applicant intended to conceal Dr. Murphy's connection to Sanders and Specialty Fertilizers from the Patent Office, thereby buttressing his credibility as an impartial witness. We see no error in the court's *Exergen* analysis, and Sanders's other arguments on this issue are likewise unavailing. As a result, we hold that the trial court did not err by allowing Mosaic to amend its complaint to add a counterclaim of inequitable conduct. Consequently, on remand, Mosaic's counterclaim will be before the court for adjudication.

## VACATED and REMANDED

### COSTS

No costs.