O’MALLEY, Circuit Judge,
concurring in part and dissenting in part.
Patent practitioners regularly call on this court to provide clear guidelines. They seek to know under precisely what circumstances governing principles will be applied, and precisely how they will be applied. While precision may be in the nature of what patent practitioners do, and the desire for defining rules in the scientific world understandable, the law does not always lend itself to such precision. Indeed, when dealing with the application of equitable principles and remedies, the law is imprecise by design.
I understand and admire the majority’s desire to respond to practitioners’ calls for precision and clarity. I also understand its concern with perceived litigation abuses surrounding assertions of inequitable conduct. I believe, however, that the majority responds to that call and addresses those concerns in ways that fail to acknowledge and remain true to the equitable nature of the doctrine it seeks to cabin.
I respectfully dissent from those portions of the majority opinion which describe the test it directs lower courts to apply in assessing materiality and which vacates and remands for further inquiry the materiality determinations made by the district court in this case. As ex *1297 plained below, I concur in the remainder of the majority’s decision and judgment.
I.
I concur in the majority’s decision to vacate and remand the judgment of the district court with instructions to reconsider its finding of inequitable conduct. Specifically, because the district court understandably referred to standards governing its intent determination drawn from our prior case law, the district court should be given the opportunity to assess, in the first instance, whether the evidence, and its credibility determinations, support a finding of a specific intent to deceive. In this regard, like the other dissenters, I agree with the majority’s holding that, as a prerequisite to a finding of inequitable conduct, a district court must find that the conduct at issue is of “sufficient culpability to require a finding of intent to deceive.” Kingsdown Med. Consultants, Ltd. v. Hollister Inc., 863 F.2d 867, 876 (Fed.Cir. 1988). In making this determination, intent to deceive and materiality must be found separately. District courts may not employ a “sliding scale,” nor may they infer intent from materiality alone.[1] Finally, I agree that a district court may infer intent from indirect and circumstantial evidence, but only where it is “the single most reasonable inference able to be drawn from the evidence.” Maj. Op. at 1290 (quoting Star Scientific Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1366 (Fed.Cir.2008)).
II.
It is at this point that my views, respectfully, diverge from those of both the majority and the other dissenters. This is so because, when addressing the types of conduct that should be deemed of sufficient concern to allow for a finding of inequitable conduct, both the majority and dissent strain too hard to impose hard and fast rules.
“The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case.” Weinberger v. Romero-Barcelo, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (quoting Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944)). While courts of equity “must be governed by rules and precedents no less than the courts of law,” Lonchar v. Thomas, 517 U.S. 314, 323, 116 S.Ct. 1293, 134 L.Ed.2d 440 (1996), “[flexibility rather than rigidity has distinguished” equitable jurisdiction, Weinberger, 456 U.S. at 312, 102 S.Ct. 1798. “Equity eschews mechanical rules; it depends on flexibility.” Holmberg v. Armbrecht, 327 U.S. 392, 396, 66 S.Ct. 582, 90 L.Ed. 743 (1946).
Traditional notions of equitable relief apply with equal force in the context of patents. eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 393-94, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006) (holding that a categorical rule of granting an injunction to a prevailing patent holder abrogates a district court’s discretion in granting equitable relief and runs afoul of traditional principles of equity). We have long recognized that the doctrine of inequitable conduct is based in equity. Kingsdown, 863 F.2d at 876 (“[T]he ultimate question of whether inequitable conduct occurred is equitable in nature.”). Despite this longstanding *1298 principle, both the majority and dissenting opinions eschew flexibility in favor of rigidity. Both opinions suggest tests for materiality to apply in all cases. Their respective materiality inquiries are black or white, while equity requires judicial consideration of shades of gray.
The majority defines materiality under a but-for test, with an exception for intentionally false affidavits filed with the PTO.[2] Maj. Op. at 1291-93. The dissent, on the other hand, defines materiality according to Rule 56. Both tests fail to provide district courts with flexibility to find inequitable conduct in an extraordinary case where the conduct in question would not be defined as such under either test. This result is contrary to the very nature of equity and centuries of Supreme Court precedent. I cannot, accordingly, lend support to either of the immutable tests proposed by my colleagues.
While the majority states that, despite the strictures of the test it adopts, “the unclean hands doctrine remains available to supply a remedy for egregious misconduct like that in the Supreme Court cases,” that statement does not address the concerns I express here.[3] Maj. Op. at 1287-88. Since, as the majority painstakingly explains, the doctrine of inequitable conduct we are defining grew, out of those “unclean hands” cases, the asserted dichotomy is a false one. See Consol Alumi-
num Corp. v. Foseco Int’l, Ltd., 910 F.2d 804, 812 (Fed.Cir.1990) (“Indeed, what we have termed ‘inequitable conduct’ is no more than the unclean hands doctrine applied to particular conduct before the PTO.”) (citations omitted). There is no support — and the majority cites none — for the proposition that inequitable conduct is somehow independent of the unclean hands principles the Supreme Court described and explained in its trilogy of cases. The remainder of the majority opinion makes clear, moreover, that the majority’s purpose, and that of the test it adopts, is to delimit and narrow the contours of the unclean hands doctrine when applied to the application process before the PTO, not to acknowledge flexibility in it.[4]
We should adopt a test that provides as much guidance to district courts and patent applicants as possible, but, in doing so, we may not disregard the equitable nature of the inquiry at hand. Thus, we must make clear that, while we believe the test we offer encompasses virtually all forms of conduct sufficient to warrant a finding of inequitable conduct, we leave open the possibility that some form of intentional misconduct which we do not currently envision could warrant equitable relief. This approach respects the Supreme Court’s recognition that courts of equity “exercise judgment in light of prior precedent, but *1299 with awareness of the fact that specific circumstances, often hard to predict in advance, could warrant special treatment in an appropriate case.” Holland v. Florida, — U.S. -, 130 S.Ct. 2549, 2563, 177 L.Ed.2d 130 (2010).
Consistent with the flexible nature of equity jurisdiction, moreover, we should recognize that determining the proper remedy for a given instance of inequitable conduct is within the discretion of district courts, subject, of course, to statutory constraints. Keystone Driller Co. v. Gen. Excavator Co., 290 U.S. 240, 245-46, 54 S.Ct. 146, 78 L.Ed. 293 (1933) (“[Courts of equity] are not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.”); Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 386, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) (“In selecting a remedy the lower courts should exercise the sound discretion which guides the determinations of courts of equity, keeping in mind the role of equity as the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims”) (internal quotations and citations omitted). While we have held previously that a finding of inequitable conduct renders unenforceable all claims of the wrongly procured patent and, in certain circumstances, related patents, this singular remedy is neither compelled by statute, nor consistent with the equitable nature of the doctrine.[5] Accordingly, I would overrule those cases and hold that, in the exercise of its discretion, a district court may choose to render fewer than all claims unenforceable, may simply dismiss the action before it, or may fashion some other reasonable remedy, so long as the remedy imposed by the court is “commensurate with the violation.” Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 465, 99 5.Ct. 2941, 61 L.Ed.2d 666 (1979); see also Hecht, 321 U.S. at 329, 64 S.Ct. 587 (“The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case.”); Miller v. French, 530 U.S. 327, 360, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000) (“These cases recognize the importance of permitting courts in equity cases to tailor relief ... to the exigencies of particular cases and individual circumstances. In doing so, they recognize the fact that in certain circumstances justice requires the flexibility necessary to treat different cases differently — the rationale that underlies equity itself.”) (Breyer, J., dissenting) (emphasis added). Allowing for flexibility in the remedy would reduce the incentive to use inequitable conduct as a litigation tactic and address many of the concerns that trouble my colleagues and were expressed by Abbott and certain amici in these en banc proceedings.[6]
*1300 III.
To provide guidance to district courts to aid in the exercise of their discretion in inequitable conduct inquiries — beyond the Supreme Court’s direction that “any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the chancellor,” Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814-16, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) — I believe such guidance should reflect the concerns expressed by the Supreme Court in the case trilogy from which the doctrine emerged. As the Court said in Precision, at minimum, equity requires that, when seeking the public benefit of a government sponsored monopoly, applicants must act “fairly and without fraud or deceit.” Id. Similarly, in Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944), the Court found that, regardless of the impact of such conduct on patentability, the doors of equity should be closed to a patentee who presented to the patent office, as impartial, an article it authored. Id. at 247, 64 S.Ct. 997.
With this general guidance in mind, I believe conduct should be deemed material where: (1) but for the conduct (whether it be in the form of an affirmative act or intentional non-disclosure), the patent would not have issued (as Chief Judge Rader explains that concept in the majority opinion); (2) the conduct constitutes a false or misleading representation of fact (rendered so either because the statement made is false on its face or information is omitted which, if known, would render the representation false or misleading); or (3) the district court finds that the behavior is so offensive that the court is left with a firm conviction that the integrity of the PTO process as to the application at issue was wholly undermined. In adopting such a test, I also believe we should confirm, as explained above, that the equitable nature of the doctrine demands that this test provide guidance only — albeit firm guidance— to district courts with respect to the exercise of their discretion in the face of inequitable conduct claims.
For the reasons ably articulated by the majority, I do not believe we should direct district courts to use Rule 56 as the measure of materiality in this context. As the majority points out, among other things, it is both too vague and too broad — leaving room for findings of inequitable conduct in circumstances not sufficiently egregious to fall within the bounds of the Supreme Court trilogy from which the doctrine emerged. I also cannot agree completely with the test proposed by the majority. Given the scope and complexity of PTO proceedings, misconduct can and does occur outside the context of written affidavits. In certain circumstances, regardless of the impact on patent issuance, such misconduct is sufficiently egregious that, when accompanied by the requisite intent to deceive, it could support a finding of inequitable conduct. Indeed, in Hazel-Atlas, the article in question was not presented to the PTO through an affidavit. 322 U.S. at 240-41, 64 S.Ct. 997. Both tests, moreover, fail to allow room to address conduct beyond their contours which equity should not ignore.
IV.
Applying the test I propose, or any reasonable test for materiality that comports with Supreme Court precedent, I would affirm the district court’s finding that the *1301 nondisclosure of information in this case was material. Indeed, I believe the omissions here qualify as material under the majority’s “but-for plus” standard and that, even accepting that test as the governing standard, a remand on the issue of materiality is neither necessary nor appropriate.
As the other dissenters note, whether the prior art taught that glucose sensors could be used to test whole blood without a protective membrane was a key focus of the PTO examiner’s patentability inquiry. After requesting permission to submit extrinsic evidence in response to a rejection from the PTO, Abbott submitted a sworn declaration from its expert Dr. Gordon Sanghera accompanied by statements from its counsel Lawrence Pope. Both contained representations to the examiner regarding what they alleged to be the appropriate understanding of the critical pri- or art reference with which the examiner was concerned. Among other things, they asserted unequivocally that one skilled in the art would not have read the prior art to say that use of a protective membrane with whole blood samples was optional. Omitted from these declarations was the fact that Abbott had made contrary representations on this same matter to the European Patent Office (“EPO”) in connection with the earlier prosecution of a European patent application. There, Abbott represented that it was “unequivocally clear” that the same prior art language meant that the protective membrane was, in fact, optional.
The district court concluded that these nondisclosures were “highly material” because “they centered on the precise sentence in question [in the prior art reference], its meaning and what it taught.” Therasense, Inc. v. Becton, Dickinson & Co., 565 F.Supp.2d 1088, 1112 (N.D.Cal. 2008). More specifically, the district court found:
This is unlike the situation where a reference is already before an examiner who can draw his or her own conclusions as to what it teaches and is able to discount spin offered by counsel. See Innogenetics, N.V. v. Abbott Labs., 512 F.3d 1363, 1379 (Fed.Cir.2008). Although the key sentence itself was indeed before Examiner Shay, the inquiry had shifted to a point of extrinsic evidence. That is, Examiner Shay had acquiesced to Attorney Pope’s request to resort to extrinsic evidence to show that the sentence would have been understood by skilled artisans differently than its words suggested. Having received permission to supply extrinsic evidence, Attorney Pope was duty-bound to present any inconsistent extrinsic information known to him. In the arena of extrinsic evidence, the examiner was unable to fend for himself. He had no way of knowing what, if any, contrary extrinsic information had been left out of the Sanghera declaration. He was completely dependent on Attorney Pope and Dr. Sanghera to fully disclose any extrinsic information, pro and con, known to them on the factual point covered by the submission.
Id. The district court’s materiality conclusions were thorough and correct. They should be affirmed.
V.
I do not weigh in on the policy debate between the majority and the dissenters. There are merits to the concerns expressed by each, and they may be relevant, in varying degrees, to the exercise of a court’s discretion in a particular case. Policy concerns cannot, however, justify adopting broad legal standards that diverge from doctrines explicated by the Supreme Court. A desire to provide immutable guidance to lower courts and parties similarly is not sufficient to justify the *1302 court’s attempt to corral an equitable doctrine with neat tests.
To the extent there are concerns with litigation abuses surrounding the improper use of this otherwise important doctrine, there are vehicles available to the district court to address those concerns. Careful application of the pleading requirements set forth in Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312 (Fed.Cir.2009), early case management techniques designed to ferret out and test unsupported inequitable conduct claims, orders to stay discovery or consideration of such claims pending all other determinations in the case, or even sanctions, are all tools district courts can employ where appropriate.
For these reasons, I concur in part in and dissent in part from the decision the majority announces today. I would leave to district courts the discretion to apply this equitable doctrine to the unique circumstances with which they are presented, while encouraging them to keep in sight their obligation to guard against abuses of it.
BRYSON, Circuit Judge,
with whom
GAJARSA, DYK, and PROST, Circuit Judges, join, dissenting.
I
There is broad consensus that the law of inequitable conduct is in an unsatisfactory state and needs adjustment. In recent years, differing standards have been applied in determining whether particular conduct rises to the level of inequitable conduct sufficient to render a patent unenforceable. That doctrinal uncertainty has had adverse consequences both for patent litigation and for the PTO. In litigation, counterclaims of inequitable conduct have been raised in too many cases and have proved difficult to resolve. In the PTO, the lack of a clear and uniform standard for inequitable conduct has led some patent prosecutors to err on the side of “over-disclosure” in order to avoid the risk of rendering all claims of an otherwise valid patent unenforceable because of the omission of some marginally relevant reference. As a result, examiners have frequently been swamped with an excess of prior art references having little relevance to the applications before them.
These problems can be traced, at least in part, to doctrinal uncertainty on three points: First, what standard of intent should be applied in assessing an allegation that an applicant has made false representations or failed to disclose material facts to the PTO. Second, what standard of materiality should be applied to such misrepresentations or nondisclosures. Third, whether there should be a “sliding scale” under which a strong showing of either materiality or intent should be able to make up for a weaker showing on the other element.
There is substantial agreement as to the proper resolution of two of those three issues. First, the parties to this case and most of the amici agree that proof of inequitable conduct should require a showing of specific intent to deceive the PTO; negligence, or even gross negligence, should not be enough. Second, the parties and most of the amici agree that a party invoking the defense of inequitable conduct should be required to prove both specific intent and materiality by clear and convincing evidence; there should be no “sliding scale” whereby a strong showing as to one element can make up for weaker proof as to the other.
However, on the remaining issue — the proper standard to apply in determining whether the conduct at issue is sufficiently material to render the patent in suit unenforceable — there is sharp disagreement. That disagreement is what divides the court in this case. The majority takes the position that nondisclosures should be *1303 deemed sufficiently material to trigger the defense of inequitable conduct only if, had the matter in question been disclosed, the applicant would not have obtained a patent. That position, however, marks a significant and, I believe, unwise departure from this court’s precedents. Since its first days, this court has looked to the PTO’s disclosure rule, Rule 56, 37 C.F.R. § 1.56, as the standard for defining materiality in inequitable conduct cases involving the failure to disclose material information. In its current form, that rule provides that information is material not only if it establishes a prima facie case of unpatentability, but also if it refutes or is inconsistent with a position the applicant takes before the PTO with respect to patentability. I would adhere to the materiality standard set forth in the PTO’s disclosure rule for two basic reasons: First, the PTO is in the best position to know what information examiners need to conduct effective and efficient examinations, i.e., what information is material to the examination process. Second, the higher standard of materiality adopted by the majority will not provide appropriate incentives for patent applicants to comply with the disclosure obligations the PTO places upon them.
Twenty-three years ago, in Kingsdown Medical Consultants v. Hollister, Inc., this court was faced with conflicting precedents regarding the “intent” requirement of the doctrine of inequitable conduct. The court resolved those conflicts in an en banc decision that all members of the court joined. 863 F.2d 867 (Fed.Cir.1988) (en banc). The court held that even proof of “gross negligence” is not sufficient to satisfy the intent to deceive requirement. Instead, the court concluded that in order for particular conduct to justify holding a patent unenforceable, the conduct in question, “viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive.” Id. at 876.
The Kingsdown court did not find it necessary to address the proper standard for determining materiality, because that issue had been addressed in earlier cases. Four years before Kingsdown, a five-judge panel opinion in J.P. Stevens & Co. v. Lex Tex Ltd., 747 F.2d 1553 (Fed.Cir.1984), had addressed the materiality requirement and made the following observations, which have remained the law until today: First, the court endorsed the principle, previously adopted by our predecessor court, that inequitable conduct is broader than common law fraud. Id. at 1559 (citing Norton v. Curtiss, 433 F.2d 779, 793 (CCPA 1970)). Second, the court explained that inequitable conduct could be based on the failure to disclose material information as well as the submission of false material information. Id. Third, the court stated that the disclosure requirement set forth in PTO Rule 56, 37 C.F.R. § 1.56 (1984), established “the appropriate starting point” because that standard “most closely aligns with how one ought to conduct business with the PTO.” J.P. Stevens, 747 F.2d at 1559. In so doing, the court referred to its earlier opinion in Driscoll v. Cebalo, 731 F.2d 878, 884 (Fed. Cir.1984), where the court had stated that PTO Rule 56 “essentially represents a codification of the ‘clean hands’ maxim as applied to patent applicants.” Moreover, just a year before the decision in Kings-down, the court in Gardco Manufacturing, Inc. v. Herst Lighting Co., 820 F.2d 1209, 1214 (Fed.Cir.1987), had reiterated that Rule 56 set forth the appropriate standard for determining the materiality of undisclosed information in an inequitable conduct case.
Since that time there have been occasional departures from the holding in Kingsdown as to the requisite level of *1304 intent to establish inequitable conduct. As to materiality, however, the court has consistently held that the PTO’s Rule 56 sets the proper baseline for determining materiality, although there has been some variation in our decisions with regard to which version of the PTO’s rule applies in particular’ cases.
The appropriate cure for departures from the principles of inequitable conduct that were put in place at the time of Kingsdown would be to reaffirm those principles, as summarized above. The majority, however, has taken a far more radical approach. With respect to the issue of materiality, the majority has adopted a test that has no support in this court’s cases and is inconsistent with a long line of precedents dating back to the early years of this court. The effect of the majority’s new test, moreover, does not merely reform the doctrine of inequitable conduct, but comes close to abolishing it altogether. I respectfully dissent from that aspect of the court’s decision. In my view, what is needed is not to jettison the doctrine of inequitable conduct, but simply to reaffirm the principles set down in the early years of this court in light of the provisions of the current PTO disclosure rule, and require adherence to those principles. As applied to the duty of an applicant or attorney to disclose material information in the course of prosecuting a patent application, those principles can be summarized as follows:
1.Inequitable conduct requires proof, by clear and convincing evidence, that the applicant or attorney intended to mislead the PTO with respect to a material matter.
2. Materiality is measured by what the PTO demands of those who apply for and prosecute patent applications. The disclosure standard that the PTO expects those parties to comply with is set forth in the current version of the PTO’s Rule 56. Under that standard, inequitable conduct requires proof that the information at issue either established, by itself or in combination with other information, a prima facie case of unpatentability, or was inconsistent with a position taken by the applicant before the PTO with respect to patentability.
3. Intent to mislead and materiality must be separately proved. There is no “sliding scale” under which the degree of intent that must be proved depends on the strength of the showing as to the materiality of the information at issue.[1]
These principles not only are consistent with our law on inequitable conduct but, if implemented consistently, should be sufficient to address the practical problems that have arisen under the current regime. While the majority is correct that inequitable conduct claims have been raised too often in the past, there are less Draconian means of addressing that problem than those proposed by the majority. First, the refinements to the doctrine suggested here would be likely to significantly reduce the frequency with which the defense is raised. Second, this court has recently held that the strict pleading requirements of Fed. R.Civ.P. 9(b) apply to counterclaims of inequitable conduct, requiring detailed factu *1305 al averments and not merely notice pleading with respect to such claims. Such pleading requirements are likely to discourage baseless counterclaims. See Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1326-29 (Fed.Cir.2009). Third, assertions of inequitable conduct that lack factual and legal support can be controlled by trial courts through application of- the sanctions provided by Fed.R.Civ.P. 11. Finally, as this court has repeatedly held, the doctrine of inequitable conduct is an equitable doctrine, and even when the elements of intent and materiality are satisfied, it remains for the district court to determine, in the exercise of its equitable judgment, whether, “in light of all the particular circumstances, the conduct of the patentee is so culpable that its patent should not be enforced.” LaBounty Mfg., Inc. v. U.S. Int’l Trade Comm’n, 958 F.2d 1066, 1070 (Fed.Cir.1992).
With regard to the problem of “over-disclosure” of large numbers of marginally relevant references in the course of patent prosecution, the PTO in its amicus brief expresses confidence that strict judicial adherence to the “clear and convincing” standard by which accused infringers must prove specific intent to deceive the PTO will largely solve that problem. Since the problem of over-disclosure directly affects the PTO, there is no reason not to credit the PTO’s assertion that a tightening of the intent element of the inequitable conduct doctrine should be sufficient to address the problem and that a drastic modification of the materiality element not only is not required, but would be contrary to the PTO’s interest in efficient examinations.
II
The majority holds that a failure to disclose information is “material” for purposes of inequitable conduct only if it satisfies the “but for” test; i.e., the conduct must be such that, but for the conduct, the claims would have been found unpatentable. This is not a tweak to the doctrine of inequitable conduct; it is fundamental change that would have the effect of eliminating the independent role of the doctrine of inequitable conduct as to disclosure obligations except in limited circumstances. This court has repeatedly rejected the “but for” test as too restrictive in light of the policies served by the inequitable conduct doctrine. See Merck & Co. v. Danbury Pharmacal, Inc., 873 F.2d 1418, 1421 (Fed. Cir.1989); see also Purdue Pharma L.P. v. Endo Pharms. Inc., 438 F.3d 1123, 1132 (Fed.Cir.2006); Hoffmann-LaRoche, Inc. v. Promega Corp., 323 F.3d 1354, 1368 (Fed.Cir.2003); Molins PLC v. Textron, Inc., 48 F.3d 1172, 1179-80 (Fed.Cir.1995); A.B. Dick Co. v. Burroughs Corp., 798 F.2d 1392, 1396 (Fed.Cir.1986). Those policies dictate that it should continue to do so.
As the PTO persuasively argues in its amicus brief, the “but for” standard for materiality is too restrictive to serve the purposes that the doctrine of inequitable conduct was designed to promote. If a failure to disclose constitutes inequitable conduct only when a proper disclosure would result in rejection of a claim, there will be little incentive for applicants to be candid with the PTO, because in most instances the sanction of inequitable conduct will apply only if the claims that issue are invalid anyway. For example, under the “but for” test of materiality, an applicant considering whether to disclose facts about a possible prior use of the invention would have little reason to disclose those facts to the PTO. If the applicant remained silent about the prior use, the patent issued, and the prior use was never discovered, the applicant would benefit from the nondisclosure. But even if the prior use was discovered during litigation, the failure to disclose would be held to constitute inequitable conduct only if the *1306 prior use otherwise rendered the relevant claims invalid. The applicant would thus lose nothing by concealing the prior use from the PTO, because he would not be at risk of losing the right to enforce an otherwise valid patent.
In that situation, particularly if the opportunity to obtain a valuable patent is at stake, there will be no inducement for the applicant to be forthcoming. If the applicant withholds prior art or misleadingly discloses particular matters and succeeds, he obtains a patent that would not have issued otherwise. Even if the nondisclosure or misleading disclosure is later discovered, under the majority’s rule the applicant is no worse off, as the patent will be lost only if the claims would otherwise be held invalid. So there is little to lose by following a course of deceit. It is no indictment of the uprightness and professionalism of patent applicants and prosecutors as a group to say that they should not be subjected to an incentive system such as that. After all, it has long been recognized that “an open door may tempt a saint.” Given the large stakes sometimes at issue in patent prosecutions, a regime that ensures that a dishonest but potentially profitable course of action can be pursued with essentially no marginal added risk is an unwise regime no matter how virtuous its subjects.
It is unrealistic to expect that other means will provide an effective deterrent to ensure that material information will not be withheld during patent prosecutions. The PTO advises us that the prospect of enforcing the duty of disclosure other than through the threat of inequitable conduct claims is not possible or practical. The prospect of agency disciplinary action for disclosure violations is unrealistic, the PTO explains, because the Office is required by statute to file any charges within five years, see 28 U.S.C. § 2462, and it seldom learns of inequitable conduct within that period of time. In addition, the PTO explains that it rarely has access to relevant facts regarding inequitable conduct, because it lacks investigative resources. As a result, the PTO has concluded that a court is the best forum in which to consider alleged breaches of the disclosure duty in the context of an inequitable conduct defense. See Patent and Trademark Office Implementation of 37 C.F.R. § 1.56,1095 Off. Gaz. Pat. & Trademark Office 16 (Oct. 11,1988).
Ill
Aside from its practical infirmities, the “but for” standard adopted by the majority is inconsistent with the duty that the Supreme Court and the PTO have both described as applying to those who seek patents in the ex parte application process.
A
The doctrine of inequitable conduct has its origins in a trilogy of Supreme Court decisions dating back to the 1930s. The first of the three cases, Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933), applied the equitable principle of “unclean hands” in a case in which a patentee’s representative had obtained a false affidavit and taken other steps to avoid the disclosure of a possibly invalidating prior use of the patented invention. The patentee obtained a favorable decree in an infringement action against a different defendant and then relied on that decree in obtaining preliminary injunctions against the defendants in the cases before the Court.
The Supreme Court found the connection between earlier and later cases to be sufficient “to show that plaintiff did not come with clean hands” in the later cases. Based on that finding, the Court concluded that the previous misconduct justified the *1307 dismissal of the complaints in those cases. In reaching that determination, the Court did not find it necessary to decide whether the evidence of prior use that the plaintiff had suppressed would have had the effect of invalidating the patent. It was enough that the improper conduct had “immediate and necessary relation to the equity [that the patentee sought] in respect of the matter in litigation.” 290 U.S. at 245, 54 S.Ct. 146.
A decade later, in Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944), the Supreme Court again held a patent unenforceable, this time in part because of misconduct by the patentee before the Patent Office in obtaining the patent. The patentee, encountering resistance to issuance of the patent by the Patent Office, arranged for the publication of an article in a trade publication that described the invention as a remarkable advance in the field. The article purported to be the product of a disinterested party, even though it was actually written by one of the patentee’s lawyers. The patent ultimately issued. The article was also used in court, where it assisted the patentee in obtaining a favorable judgment from an appellate court. The patentee subsequently went to considerable lengths to ensure that the truth regarding the authorship of the article would not emerge. The efforts at concealment failed, however, and the accused infringer sought relief in the lower court based on the misconduct.
Because the misconduct was discovered after the expiration of the term of court during which the judgment in question was entered, the Supreme Court invoked the doctrine of after-discovered fraud, which permitted a court to revisit a judgment even after the end of the term in which it was entered, if the circumstances “are deemed sufficiently gross to demand a departure from rigid adherence to the term rule.” 322 U.S. at 244, 64 S.Ct. 997. The Court found that standard to be satisfied on the facts before it.
In response to the argument that the article in question was not “basic” to the issues in litigation, the Supreme Court stated that the circumstances did not “call for such an attempted appraisal.” 322 U.S. at 247, 64 S.Ct. 997. The Court explained: “Hartford’s officials and lawyers thought the article material. They conceived it in an effort to persuade a hostile Patent Office to grant their patent application, and went to considerable trouble and expense to get it published.” Id. The Court added that Hartford’s fraud “had its genesis in the plan to publish an article for the deliberate purpose of deceiving the Patent Office.... Had the District Court learned of the fraud on the Patent Office at the original infringement trial, it would have been warranted in dismissing Hartford’s case.” Id. at 250, 64 S.Ct. 997. Significantly, the Court did not regard the issue of Hartford’s conduct as turning on whether the fraudulent conduct was the “but for” cause of the issuance of the patent. The Court stated that it would have come to the same conclusion even if the statements from the fraudulently procured article were actually true. Id. at 247, 64 S.Ct. 997. “But for” causation was not necessary to finding materiality. Instead, the Court focused on the patentee’s “deliberate purpose of deceiving the Patent Office” as the core reason for refusing to enforce the patentee’s rights in the patent.
A year later, the Supreme Court again addressed the issue of the effect of misconduct during proceedings before the Patent Office on subsequent patent enforcement actions in court. That case, Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945), *1308 arose following an involved sequence of events, the upshot of which was that Automotive obtained rights to a patent knowing that the original applicant had made false statements pertaining to the dates of conception and reduction to practice of the claimed invention. The Supreme Court held the patent unenforceable, applying the doctrine of unclean hands against the patent owner based on its knowledge of the misconduct that occurred during the prosecution of the patent.
The Court explained that the sort of misconduct necessary to trigger a court’s refusal to aid “the unclean litigant” need not be “of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the chancellor.” 324 U.S. at 815, 65 S.Ct. 993. The Court added that “where a suit in equity concerns the public interest as well as the private interests of the litigants this doctrine assumes even wider and more significant proportions.” Id. The enforcement of a patent, the Court stated, is a matter “concerning far more than the interests of the adverse parties. The possession and assertion of patent rights are ‘issues of great moment to the public.’ ” Id. In a statement that has served as the basis for the subsequent development of the doctrine of inequitable conduct, the Court added that “[t]he far-reaching social and economic consequences of a patent ... give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct.” Id. at 816, 65 S.Ct. 993.
The Court refused to enforce Automotive’s patent because it concluded that Automotive “knew and suppressed facts that, at the very least, should have been brought in some way to the attention of the Patent Office.” 324 U.S. at 818, 65 S.Ct. 993. The Court explained, “Those who have applications pending with the Patent Office or who are parties to Patent Office proceedings have an uncompromising duty to report to it all facts concerning possible fraud or inequitableness underlying the applications in issue.... Public interest demands that all facts relevant to such matters be submitted formally or informally to the Patent Office, which can then pass upon the sufficiency of the evidence. Only in this way can that agency act to safeguard the public in the first instance against fraudulent patent monopolies.” Because Automotive had prosecuted the patent application and obtained the patent “without ever attempting to reveal to the Patent Office or to anyone else the facts it possessed concerning the application’s fraudulent ancestry,” the Court concluded that Automotive “has not displayed that standard of conduct requisite to the maintenance of this suit in equity.” Id. at 819, 65 S.Ct. 993.
As in the Keystone and Hazel-Atlas cases, the Supreme Court in the Precision Instrument case did not look to whether the conduct in question would have rendered the plaintiffs application unpatentable. In holding all of Automotive’s patents to be unenforceable, the Court found it was enough that the plaintiff had intentionally withheld information from the Patent Office that should have been submitted so that the Patent Office could consider it. There was no suggestion in the Court’s opinion that the dismissal of the action would be appropriate only if, but for the conduct, the patent would not have issued.
The principles set down by the Court in Keystone, Hazel-Atlas, and Precision Instrument can be summarized as follows: (1) the public has a special interest in seeing that patent monopolies “spring *1309 from backgrounds free from fraud or other inequitable conduct”; (2) as a corollary to that public interest, patent applicants “have an uncompromising duty to report to [the Patent Office] all facts concerning possible fraud or inequitableness underlying the applications”; (3) all facts relevant to such matters must be submitted to the Patent Office, “which can then pass upon the sufficiency of the evidence”; (4) the intentional failure to disclose to the Patent Office that a patent application is tainted by fraud is sufficient cause to justify not enforcing the patent; and (5) the misconduct in question need not constitute actionable fraud; it is sufficient if the conduct constitutes a willful act that violates standards of equitable conduct in dealing with the Patent Office.[2]
Shortly after the decisions in the Keystone, Hazel-Atlas, and Precision Instrument cases, the Supreme Court made a further observation that bears directly on the responsibilities of attorneys and applicants who appear before the PTO. The Court endorsed the statement that, “By reason of the nature of an application for patent, the relationship of attorneys to the Patent Office requires the highest degree of candor and good faith. In its relation to applicants, the Office ... must rely upon their integrity and deal with them in a spirit of trust and confidence.... ” Kingsland v. Dorsey, 338 U.S. 318, 319, 70 S.Ct. 123, 94 L.Ed. 123 (1949). Because the PTO lacks the investigative and research resources to look behind representations by applicants and their counsel, it necessarily relies on those representations as to many facts that arise during the prosecution of patent applications, including experimental results obtained by the applicants, the state of the prior art, and the knowledge of persons of skill in the art in the field in question. Some of these facts will be uniquely in the hands of the appli *1310 cant and, as a practical matter, undiscoverable by an examiner at the PTO. For those reasons, the PTO has imposed a duty on applicants to provide examiners with information that is material to patent-ability.
B
The PTO has defined the disclosure obligation for those involved in patent prosecutions in its Rule 56, which the PTO has promulgated under its statutory authority to establish regulations that “govern the conduct of proceedings in the Office.” 35 U.S.C. § 2(b). When Rule 56 was first promulgated in 1949, the portion of the rule that addressed inequitable conduct provided that “any application fraudulently filed or in connection with which any fraud is practiced or attempted on the Patent Office, may be stricken.” 37 C.F.R. § 1.56 (1950).
The Court of Customs and Patent Appeals construed the PTO’s disclosure rule in its 1970 decision in Norton v. Curtiss, 433 F.2d at 779. The court in that case upheld the Commissioner’s authority to strike a patent application for fraud on the PTO in violation of the PTO’s Rule 56. Interpreting the term “fraud” in Rule 56, the court began by noting that the term should not be limited to the kind of fraud that would be independently actionable as a tort or crime (which the court referred to as “technical fraud”). Instead, the court explained that “fraud” as used in the Rule included “a wider range of ‘inequitable’ conduct” that would justify holding a patent unenforceable. Id. at 793. Defining fraud more broadly for the purpose of Rule 56 was justified, the court ruled, because “applicants before the Patent Office are being held to a relationship of confidence and trust to that agency. The indicated expansion of the concept of ‘fraud’ manifests an attempt by the courts to make this relationship meaningful.” Id.
In language paralleling the Supreme Court’s discussion in Kingsland v. Dorsey, the Norton court recognized “a relationship of trust between the Patent Office and those wishing to avail themselves of the governmental grants which that agency has been given authority to issue.” 433 F.2d at 793. In light of the ex parte nature of patent prosecution, the number of applications filed, and the limited capacity of the PTO “to ascertain the facts necessary to adjudge the patentable merits of each application,” the court stated that the “highest standards of honesty and candor on the part of applicants presenting such facts to the office are ... necessary elements in a working patent system.” Id. at 794. For that reason, the court approved of “the expansion of the types of misconduct for which applicants will be penalized.” Id.
In light of those policies, the court explained that the test for materiality “cannot be applied too narrowly if the relationship of confidence and trust between applicants and the Patent Office is to have any real meaning,” and that findings of materiality should not be limited to those cases in which the true facts, if they had been known, “would most likely have prevented the allowance of the particular claims at issue.” 433 F.2d at 795. In such cases, the claims at issue “would probably be invalid, in any event,” and the question whether the patent was unenforceable “would really be of secondary importance.” Id. Accordingly, the court concluded that a proper interpretation of the materiality element must include factors other than the patentability of the claims at issue, including “the subjective considerations of the examiner and the applicant.” Id.
In 1977, the PTO substantially revised Rule 56 to make more explicit the disclosure obligations imposed on patent appli *1311 cants. Patent Examining and Appeal Procedures, 41 Fed.Reg. 43,729, 43,730 (proposed Oct. 4, 1976). The 1977 version of the rule imposed a “duty of candor and good faith” on those involved in the preparation or prosecution of patent applications and required them “to disclose to the Office information they are aware of which is material to the examination of the application.” The rule defined information as “material” if there was “a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.”
Shortly after this court’s creation, the court began addressing inequitable conduct claims raised in the course of patent infringement litigation. From the outset, the court looked to the PTO’s Rule 56 as setting an appropriate standard for the materiality prong of the doctrine of inequitable conduct. See Am. Hoist & Derrick Co. v. Sowa & Sons, Inc., 725 F.2d 1350, 1363 (Fed.Cir.1984) (“The PTO ‘standard’ is an appropriate starting point for any discussion of materiality”; failure to satisfy that disclosure obligation, combined with an intent to deceive the PTO, can render a patent unenforceable); J.P. Stevens, 747 F.2d at 1559 (adopting the materiality requirement from Rule 56); Gardco, 820 F.2d at 1214 (Rule 56 is “appropriate starting point for determining materiality”) (quotation omitted); Fox Indus., Inc. v. Structural Pres. Sys., 922 F.2d 801, 803 (Fed.Cir.1990) (adopting Rule 56 standard for materiality). In particular, the court endorsed the use of that standard as the proper test for materiality when an appropriate level of intent was shown. See Specialty Composites v. Cabot Corp., 845 F.2d 981, 992 (Fed.Cir.1988) (“Nondisclosed or false information is material if there is a substantial likelihood that a reasonable examiner would have considered the omitted reference or false information important in deciding whether to allow the application to issue as a patent.”); Halliburton Co. v. Schlumberger Tech. Corp., 925 F.2d 1435, 1440 (Fed.Cir.1991) (“Information is material if there is ‘substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.’ ”) (citing the 1977 version of PTO Rule 56).
In the ensuing years, this court has regularly referred to the “reasonable examiner” test as the standard for measuring materiality in cases raising claims of inequitable conduct. See, e.g., Golden Hour Data Sys., Inc. v. emsCharts, Inc., 614 F.3d 1367, 1373-74 (Fed.Cir.2010); Leviton Mfg. Co. v. Universal Sec. Instruments, Inc., 606 F.3d 1353, 1358-59 (Fed. Cir.2010); Astrazeneca Pharms. LP v. Teva Pharm. USA Inc., 583 F.3d 766, 773 (Fed.Cir.2009); Dayco Prods., Inc. v. Total Containment, Inc., 329 F.3d 1358, 1363 (Fed.Cir.2003) (citing cases). Under that test, the court has consistently ruled that a false statement or nondisclosure may be material for purposes of an inequitable conduct determination even if the invention in question would otherwise be patentable. See, e.g., Digital Control, Inc. v. Charles Mach. Works, 437 F.3d 1309, 1314 (Fed.Cir.2006); Li Second Family Ltd. P’ship v. Toshiba Corp., 231 F.3d 1373, 1380-81 (Fed.Cir.2000); PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc., 225 F.3d 1315, 1322 (Fed.Cir.2000); A.B. Dick, 798 F.2d at 1397.
In 1992, the PTO revised Rule 56, adopting what it called a “clearer and more objective definition of what information the Office considers material to patentability.” Duty of Disclosure, 57 Fed.Reg.2021, 2023 (Jan. 17, 1992). As revised in 1992, the current version of Rule 56 imposes a duty on individuals associated with the filing and prosecution of an application to disclose to the Office all information known to be material to patentability as defined in *1312 the rule. Rule 56(a). The rule then states that information is “material” if it is “not cumulative to information already of record or being made of record in the application” and
(1) It establishes, by itself, or in combination with other information, a prima facie case of unpatentability of a claim; or
(2) It refutes, or is inconsistent with, a position the applicant takes in:
(i) Opposing an argument of unpatentability relied on by the Office, or
(ii) Asserting an argument of patentability.
The first part of Rule 56(b) requires the applicant to provide information that, at least absent explanation or further supplementation, would compel the conclusion that the invention is unpatentable. The rule explains that a “prima facie case of unpatentability” is established “when the information compels a conclusion that a claim is unpatentable under the preponderance of the evidence, burden-of-proof standard, giving each term its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability.” In adopting the rule, the PTO explained that it intended for applicants to submit references, of which they were aware, that would render the pending claims unpatentable over the references. Proposed Rules, 56 Fed.Reg. 37,321, 37,324 (Aug. 6, 1991). The PTO added that it is the role of the examiner, not the applicant, to analyze the sufficiency and weight of a rebuttal argument. See id. The intent standard imposed by Rule 56 and adopted by this court answers the majority’s concerns regarding the breadth of the first part of Rule 56(b). That provision applies only to applicants who act with the specific intent to deceive the PTO by withholding prior art that is so powerful as to render the pending claims invalid in the absence of further explanation.
It is the second part of the rule, Rule 56(b)(2), to which the appellants object. That part of the rule requires the applicant to provide information that is inconsistent with or refutes a position taken by the applicant before the office. Rule 56(b)(2) clearly goes beyond a “but for” test and is therefore the focus of the dispute in this case.
At the time it adopted the 1992 revision to Rule 56, the PTO considered the possibility of adopting a “but for” test of materiality of the sort that the majority has adopted today. The Office rejected that test, concluding that adopting such a narrow standard “would not cause the Office to obtain the information it needs to evaluate patentability so that its decisions may be presumed correct by the courts.” The PTO added that if it did not have the needed information, “meaningful examination of patent applications will take place for the first time in an infringement case before a district court.” Duty of Disclosure, 57 Fed.Reg. at 2023.
In the aftermath of that change, this court has frequently treated the PTO’s new version of the rule as setting forth the proper standard for materiality, in cases involving claims of failure to disclose material information, at least for applications processed after 1992. In Bruno Independent Living Aids, Inc. v. Acorn Mobility Services, Ltd., 394 F.3d 1348 (Fed.Cir. 2005), the court quoted the 1992 version of Rule 56 and held that for patents prosecuted while that version of the rule was in effect, “we evaluate the materiality of the [undisclosed matter] under the standard set forth in the applicable amended rule.” Id. at 1352-53; see also Hoffinann-LaRoche, 323 F.3d at 1368 n. 2. The court added that “we give deference to the PTO’s formulation at the time an application is being prosecuted before an examin *1313 er of the standard of conduct it expects to be followed in proceedings in the Office.” Bruno, 394 F.3d at 1353; see also Bd. of Educ. v. Am. Bioscience, Inc., 333 F.3d 1330, 1343 (Fed.Cir.2003); Purdue Pharma L.P., 438 F.3d at 1129; Monsanto Co. v. Bayer Bioscience N.V., 514 F.3d 1229, 1237 (Fed.Cir.2008); Taltech Ltd. v. Esquel Enters. Ltd., 604 F.3d 1324, 1333 (Fed. Cir.2010). As it did before 1992, the court has continued to make clear that it does not apply a “but for” test for materiality. See Golden Hour Data Sys., 614 F.3d at 1374; Hoffmann-LaRoche, 323 F.3d at 1368; Molins PLC, 48 F.3d at 1179-80.
On occasion, when addressing the issue of materiality, this court has referred to both the 1977 standard and the 1992 standard that supplanted it as pertinent to the definition of materiality. See, e.g., Digital Control, 437 F.3d at 1316. The court has done so in light of the fact that, as the PTO has explained, the 1992 standard was not meant to signal a sharp departure from the 1977 standard. Yet while the two standards were not meant to be dramatically different, the court has recognized that the PTO regards the 1992 standard as setting forth a clearer and more precise statement of the disclosure necessary to conducting efficient examinations. See Rothman v. Target Corp., 556 F.3d 1310, 1323 (Fed.Cir.2009); Purdue Pharma L.P., 438 F.3d at 1129; Pharmacia Corp. v. Par Pharm., Inc., 417 F.3d 1369, 1373 (Fed.Cir.2005).
The PTO has explained that the 1992 amendment was proposed “to address criticism concerning a perceived lack of certainty in the materiality standard.” M.P.E.P. § 2001.04. The revised rule was intended “to provide greater clarity and hopefully minimize the burden of litigation on the question of inequitable conduct before the Office, while providing the Office with the information necessary for effective and efficient examination of patent applications.” Id. Moreover, in its brief in this case the PTO has urged this court to adopt the standard set forth in the current PTO Rule 56 as the standard for material nondisclosures rather than referring to both the 1992 standard and the “reasonable examiner” standard from the 1977 version of the Rule.
Because the PTO is the best judge of what information its examiners need to conduct effective examinations, the PTO’s definition of materiality is entitled to deference in determining whether the failure to disclose particular information during patent prosecution constitutes inequitable conduct. Moreover, because the PTO has refined the materiality standard in setting forth what it expects of applicants and their representatives, there is no need for courts to apply a broader test of materiality in adjudicating inequitable conduct claims, as doing so could at least theoretically result in the imposition of sanctions for a failure to disclose matters that the PTO does not require to be disclosed.[3] *1314 This is not to suggest that any disclosure requirement that the PTO might have devised would serve as a predicate for an inequitable conduct charge. Because inequitable conduct is an equitable doctrine applied by courts, and not simply a mechanism for judicial enforcement of PTO rules, the scope of the court-made doctrine is not inseparably tied to the breadth of the PTO’s disclosure rules. However, the basic purposes of both the inequitable conduct doctrine and Rule 56 are the same, and the disclosure duties that the PTO imposes on applicants, which are defined by Rule 56, are reasonably calculated to produce the disclosure necessary to promote efficient conduct of examinations and to discourage the types of omissions and misrepresentations that (if made intentionally) raise equitable concerns. In these circumstances, considerations of efficiency and economy encourage us to embrace the PTO’s approach. So long as it reasonably aligns with our own equitable calculus, we should defer to the PTO’s assessment of its needs and treat intentional breaches of the PTO’s disclosure rules as providing a basis for a finding of inequitable conduct. See Bruno Indep. Living, 394 F.3d at 1353.
C
The materiality standard set forth in Rule 56, as adopted in 1977 and refined in 1992, is not an idiosyncratic contrivance of the PTO; quite the contrary, it is consistent with the materiality standard that is applied in a wide variety of other analogous contexts. Although the relationship between the PTO and patent applicants is unusual in our law, it is nonetheless appropriate to look to the way the concept of materiality is applied in other areas, as disclosure obligations and requirements of candor are imposed on parties in a wide variety of settings.
Securities law provides a particularly instructive analogy, as proxy issuers and corporate insiders often have access to information relevant to a stockholder’s decision that even the most diligent investor could not discover. Similarly, a patent applicant is often in a better position than the examiner to know of relevant art or potentially invalidating circumstances, such as prior use. Notably, in the securities law context, a nondisclosure is typically regarded as material without the need to prove reliance. Thus, for example, in the case of those who have an affirmative *1315 duty of disclosure to investors under the securities laws and who fail to comply with that duty, the Supreme Court has held that “positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [the investment] decision.” Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). The Supreme Court recently reaffirmed that standard in Matrixx Initiatives, Inc. v. Siracusano, — U.S. -, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011). In a passage that addressed concerns similar to those raised in this case, the Court explained that it had adopted the “reasonable investor” standard to ensure that investors would have access to information important to their investment decisions, while being “careful not to set too low a standard of materiality, for fear that management would bury the shareholders in an avalanche of trivial information.” Id. at 1318 (quotations and citations omitted).
The Supreme Court has adopted a similar materiality standard — and rejected a “but for” test for materiality — in the context of section 14(a) of the Securities Exchange Act of 1934, regarding proxy solicitations. See TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). There, the Court stated that an omitted fact is material “if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.” Id. at 449, 96 S.Ct. 2126. Significantly, for our purposes, the Court added that the proper standard
does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.

Id.

Even in criminal proceedings that require proof of materiality, such as prosecutions under the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, a “but for” test of materiality is not applied. Those laws penalize not only affirmative misrepresentations, but also the concealment of material facts. United States v. Olatunji 872 F.2d 1161, 1167 (3d Cir. 1989); United States v. O’Malley, 707 F.2d 1240, 1247 (11th Cir.1983). When a charge of mail or wire fraud is based on the nondisclosure of material information in violation of a duty to disclose, proof of materiality does not require a showing of actual reliance on the part of the victim; all that is required is proof that the nondisclosure or concealment be capable of influencing the intended victim. See Neder v. United States, 527 U.S. 1, 16, 24-25, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). See also United States v. Riley, 621 F.3d 312, 332-33 (3d Cir.2010) (nondisclosed relationship between mayor and purchaser of city property was material “even if the relationship would not have per se barred [the purchase].”); United States v. Szur, 289 F.3d 200, 211-12 (2d Cir.2002) (securities broker owed duty to customers to disclose that broker would earn “exorbitant” commission on trades; such information was material for the purpose of the wire fraud statute because it would have been “relevant to a customer’s decision to purchase the stock”); United States v. Bronston, 658 F.2d 920, 926 (2d Cir.1981) (concealment of information that defendant is under a duty to disclose is material if the nondisclosure “could or does result in harm” to the victim).
The same principles have been applied to nondisclosures of material information *1316 in civil matters, even civil matters that have been regarded as having grave personal consequences. In a denaturalization proceeding, for example, a “concealment or misrepresentation” made in the course of the naturalization process is considered “material” under 8 U.S.C. § 1427(a) if it has “a natural tendency to influence the decisions of the Immigration and Naturalization Service”; it is not necessary to show that the nondisclosure or misrepresentation in question actually had such an effect. See Kungys v. United States, 485 U.S. 759, 772, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988). The Supreme Court noted in that case that it “has never been the test of materiality that the misrepresentation or concealment would more likely than not have produced an erroneous decision, or even that it would more likely than not have triggered an investigation.” Id. at 771, 108 S.Ct. 1537 (emphasis in original).
Even with respect to the common law action for fraud, deceit, and misrepresentation, which is more exacting than the doctrine of inequitable conduct, see J.P. Stevens & Co., 747 F.2d at 1559, the “but for” test does not apply to the element of materiality. In that setting, as the Restatement of Torts explains, a matter is material if “a reasonable man would attach importance to its existence or nonexistence in determining his choice of action,” or if the maker of the representation “knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action.” Restatement (Second) of Torts § 538 (1977); see Neder v. United States, 527 U.S. 1, 22 & n. 5, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (citing the Restatement as setting forth the materiality requirement for common-law fraud). In order for a material misrepresentation to satisfy the causation requirement needed for an award of damages, it is necessary for the plaintiff to show reliance on the misrepresentation. However, the “but for” test does not apply even to tort actions for damages, as it is not necessary for the plaintiff to show “that he would not have acted or refrained from' acting as he did unless he had relied on the representation.” Restatement (Second) of Torts § 546, cmt. b. In none of these settings has the test for materiality been set at the high “but for” level adopted by the majority in this case.[4]
*1317 The course charted by the majority is thus contrary to the Supreme Court decisions that gave rise to the doctrine of inequitable conduct, to a long line of our own precedent, and to the principles of materiality that courts have applied in other contexts. Under this court’s new rule, an applicant who conceals information with the intent to deceive the PTO will be free to enforce his patent unless it can be proved by clear and convincing evidence that the patent would not have issued but for the fraud. Even though the majority justifies its new rule in part by asserting that it will improve the prosecution of patents before the PTO, I am convinced that the new rule is likely to have an adverse impact on the PTO and the public at large, a view that — significantly—is shared by the PTO itself.
IV
The facts of this case, as found by the district court, illustrate why the materiality standard of Rule 56 is a suitable test for inequitable conduct claims based on disclosure violations. A central issue during the examination that led to the issuance of the '551 patent was whether the prior art had taught that glucose sensors could be used to test whole blood without a protective membrane. The examiner focused on whether the prior art '382 patent taught the use of sensors without membranes. On its face, the '382 patent seemed to teach that sensors could be used without membranes when testing whole blood because the specification of the '382 patent, when discussing the use of sensors with whole blood, stated the following:
Optionally, but preferably when being used on live blood, a protective membrane surrounds both the enzyme and the mediator layers, permeable to water and glucose molecules.
'382 patent, col. 4, 11. 63-66. A central issue before the examiner was whether the use of the term “optionally” in that passage indicated that it was possible to use the sensors in whole (or live) blood without a protective membrane.
The district court found that the persons involved in prosecuting the '551 application, Abbott’s attorney Lawrence Pope and its expert, Dr. Gordon Sanghera, made representations to the examiner that the pertinent passage in the '382 patent should not be taken at face value. In particular, Dr. Sanghera submitted a declaration in which he stated that even though the '382 patent referred to the use of a protective membrane surrounding the enzyme and mediator layers of the glucose meter as “optionally, but preferably” present, “one skilled in the art would have felt that an active electrode comprising an enzyme and a mediator would require a protective membrane if it were to be used with a whole blood sample.” For that reason, he stated, he was “sure that one skilled in the art would not read [the '382 patent] to teach that the use of a protective membrane with a whole blood sample is optionally or merely preferred.” Mr. Pope, the prosecuting attorney, added his own re *1318 marks when submitting Dr. Sanghera’s declaration. He stated: “One skilled in the art would not have read the disclosure of the ['382 patent] as teaching that the use of a protective membrane with whole blood samples was optional. He would not, especially in view of the working examples, have read the optionally, but preferably language ... as a technical teaching but rather mere patent phraseology.” Mr. Pope added: “There is no teaching or suggestion of unprotected active electrodes for use with whole blood specimens in [the '382] patent or the other prior art of record in this application.” Shortly after those submissions were made, the examiner allowed the claims for a membraneless sensor.
The problem, the district court found, is that Abbott had made directly contradictory representations to the European Patent Office (“EPO”) concerning the teaching of the '382 patent in connection with the prosecution of a European patent application and had not disclosed those contradictory representations to the PTO. Before the EPO, Abbott represented that the European counterpart to the '382 patent referred to a “protective membrane optionally utilized with the glucose sensor of the patent,” and that the membrane was “preferably to be used with in vivo measurements.” With specific reference to the language from the patent reciting the use of the protective membrane “optionally, but preferably when being used on live blood,” Abbott told the EPO: “It is submitted that this disclosure is unequivocally clear. The protective membrane is optional, however, it is preferred when used on live blood in order to prevent the larger constituents of the blood, in particular erythrocytes from interfering with the electrode sensor.”
The district court found that Abbott’s representations to the EPO contradicted its representations to the PTO, made through Dr. Sanghera and Mr. Pope. The court’s finding on that issue, made after a detailed analysis of the representations to the two bodies, cannot be held to be clearly erroneous. The district court also found that Abbott’s failure to disclose to the examiner that it had made inconsistent statements ‘to the EPO regarding the teaching of the '382 patent was highly material. In particular, the court found that the failure to disclose the inconsistency in those statements was the kind of nondisclosure covered by PTO Rule 56, as being nondisclosure of information “inconsistent with a position the applicant takes in ... [asserting an argument of patentability.” That finding, too, cannot be regarded as clearly erroneous in light of the central role of the pertinent portion of the '382 patent in the examination of the application that led to the issuance of the '551 patent.
Turning to the issue of intent, the district court found that Abbott’s failure to disclose material information was intentional, i.e., it was made with the specific intent to deceive the PTO. The district court heard live testimony from Mr. Pope and Dr. Sanghera and conducted a detailed analysis of their testimony in light of the record. Based on that analysis, the court concluded that their efforts to justify their conduct were unpersuasive. The court found that Mr. Pope and Dr. Sanghera were aware of the contrary representations made to the EPO and consciously chose to withhold them from the PTO. The court carefully considered their explanations for their failure to disclose the references and found each witness’s explanation to be lacking. The court discredited Mr. Pope’s explanation that he understood the term “unequivocally clear” in the EPO submission to relate to the permeability of the membrane, not to the text immediately following the words “unequivocally clear,” where it is plainly stated that the membrane is optional. The court was *1319 not persuaded by Mr. Pope’s statement that he believed “optionally, but preferably” meant, in the context of patents, “optionally, but always.”
The court then considered possible alternative reasons for Mr. Pope’s decision not to disclose the contradictory EPO statements, such as the possibility that Mr. Pope had misunderstood the meaning of the terms “whole blood” and “live blood.” Ultimately, however, the district court could identify no plausible reason for the nondisclosure and therefore found that Mr. Pope had acted with deceptive intent. That finding, based on the court’s consideration of Mr. Pope’s demeanor and overall credibility, as well as the court’s analysis of the record as a whole, cannot be said to be clearly erroneous.
For similar reasons, the court found that Dr. Sanghera also acted with intent to deceive the PTO. The court considered and rejected the possibility that Dr. Sanghera believed that Mr. Pope, Abbott’s counsel before the PTO, would disclose the material information. The court began by finding that Dr. Sanghera’s declaration before the PTO contained representations that were misleading by omission. The court explained that finding as follows:
He did not have to take this extra step. Having done so, he was obligated to avoid intentional deception. His sworn statements to the PTO about the meaning of the “optionally but preferably” sentence were known by him to be inconsistent with his own company’s statements to the EPO — statements he had himself helped craft.
As to Dr. Sanghera’s testimony that he believed that statements he made to the PTO did not contradict the statements made to the EPO, the court found that Dr. Sanghera knew that a representation had been made to the EPO that the '326 patent did not require a membrane when used with whole blood. Noting that Dr. Sanghera’s trial testimony had been impeached by his prior- inconsistent statements on certain points, and finding that Dr. Sanghera exhibited an “unconvincing trial demeanor,” the district court found that he acted with the requisite intent to deceive. As in the case of Mr. Pope, the district court’s findings as to Dr. Sanghera are not clearly erroneous.
Viewed in light of the district court’s findings, this case is a compelling one for applying the principles of inequitable conduct. The district court found that Abbott’s representatives deliberately withheld material from the PTO that directly refuted Abbott’s contention that one skilled in the art would have believed that the '382 patent taught that a membrane was required for whole blood analysis. Abbott’s inconsistent position on the teachings of this critical reference falls squarely within the scope of information of the sort referred to in PTO Rule 56(b)(2), i.e., information that “refutes, or is inconsistent with, a position the applicant takes in ... [ajsserting an argument of patentability.” Given the examiner’s focus on the issue of whether the protective membrane in the prior art patent was optional or not, the issue was of critical importance in the prosecution of the application that issued as the '551 patent, even though the undisclosed information, if revealed, may not have resulted in the rejection of the claims at issue. Accordingly, the district court made all the findings necessary to support its holding that the '551 patent was unenforceable for inequitable conduct.[5] Be *1320 cause the district court’s factual findings are not clearly erroneous and because its legal analysis comports with the proper role of the doctrine of inequitable conduct in patent law, the district court’s judgment that the '551 patent is unenforceable for inequitable conduct should be affirmed.
I respectfully dissent.

. While I join this portion of the majority opinion (Part V), I do so with the understanding that the majority does not hold that it is impermissible for a court to consider the level of materiality as circumstantial evidence in its intent analysis. As in all other legal inquiries involving multiple elements, the district court may rely on the same items of evidence in both its materiality and intent inquiries. A district court must, however, reach separate conclusions of intent and materiality and may not base a finding of specific intent to deceive on materiality alone, regardless of the level of materiality.

. The majority responds to this characterization, and to the general criticism in this opinion, by defining its test more broadly and acknowledging a degree of flexibility within its four corners. For that, I applaud the majority. I do not think, however, that this additional explanation is sufficient to address all of the concerns expressed in this opinion. I remain of the view that the test I propose here is the most consistent with the doctrine’s origins.

. Indeed, this language raises some additional concerns. If "unclean hands” remains available in cases of PTO misconduct, charges of unclean hands could simply supplant the very allegations of inequitable conduct the majority seeks to curb.

.At the other end of the spectrum, the dissent’s acknowledgement that a district court retains discretion to decline to find inequitable conduct even in the face of evidence of materiality and intent is similarly insufficient to undercut the unyielding nature of the test for inequitable conduct it adopts. It clearly does not allow, for instance, for a finding of inequitable conduct for conduct not encompassed by Rule 56.

. While the 1952 Act codified the defense of unclean hands in paragraph (1) of 35 U.S.C. § 282, it did not specify a remedy. See 35 U.S.C. § 282 (providing that "unenforceability” is a defense to an infringement action); P.J. Federico, "Commentary on the New Patent Act,” 75 J. Pat. & Trademark Off. Soc’y 161, 215 (1993) (explaining that paragraph (1) includes "equitable defenses such as laches, estoppel and unclean hands”). The statute, thus, provides no guidance as to whether, in its equitable discretion, a court may render some, but not all, claims unenforceable. In J.P. Stevens & Co. v. Lex Tex, Ltd., 747 F.2d 1553 (Fed.Cir.1984), we cited cases collected from a treatise for the proposition that inequitable conduct renders all of a patent's claims unenforceable. Id. at 1561. None of those cases, however, are binding on this court and, for the reasons stated above, I find this proposition inconsistent with the power of the Chancellor to "mould” each decree to the necessities of the particular case.

. One of the evils described by Abbott and amici is the possibility of an order barring enforcement of a patent based on misrepresentation of an applicant’s "small entity status.” To the extent unenforceability may be too harsh in such circumstances — a point on *1300 which I do not opine — district courts would have discretion to fashion some lesser remedy to address that form of intentional deception.

. It is important to distinguish between relaxing the required proof of intent if the proof of materiality is strong, which is impermissible, as opposed to considering the degree of materiality as relevant to the issue of intent, which is appropriate, particularly given that direct evidence of intent, such as an admission of deceptive purpose, is seldom available. See Cargill, Inc. v. Canbra Foods, Ltd., 476 F.3d 1359, 1366 (Fed.Cir.2007); Ferring B.V. v. Barr Labs., Inc., 437 F.3d 1181, 1190-91 (Fed.Cir.2006); GFI, Inc. v. Franklin Corp., 265 F.3d 1268, 1274 (Fed.Cir.2001); Paragon Podiatry Lab., Inc. v. KLM Labs., Inc., 984 F.2d 1182, 1189 (Fed.Cir.1993); Merck & Co. v. Danbury Pharmacal, Inc., 873 F.2d 1418, 1422 (Fed.Cir.1989).

. Two decades before the Keystone-Hazel-Precision trilogy, the Supreme Court considered the effect of misstatements made during prosecution on the validity of a patent on a method for vulcanizing rubber. Corona Cord Tire Co. v. Dovan Chem. Corp., 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610 (1928).
Before the Patent Office, the inventor attempted to swear behind a reference by submitting affidavits averring an earlier date of conception and reduction to practice for his invention. The inventor asserted that he had successfully used the claimed method "in the vulcanization of rubber goods,” and one of his fellow chemists stated that the method had been used "in the actual vulcanization of rubber goods, such as hose, tires, belts, valves and other mechanical goods.” Id. at 373, 48 S.Ct. 380. In fact, at the time referred to in the affidavits the inventor had used his method only on test slabs of rubber. The Court noted that whether the claimed method was used in the production of useful articles was not relevant to the asserted claims, and it therefore held that the false affidavit, while reckless, was not "the basis for” or "essentially material to” the issuance of the patent. The Court therefore declined to invalidate the asserted claims on that ground. Id. at 374, 48 S.Ct. 380.
Although the majority cites Corona as support for its narrow interpretation of the materiality requirement for inequitable conduct, Corona is of little relevance to that issue. Corona predates the creation of the inequitable conduct doctrine and has never been cited by the Supreme Court in any case addressing unclean hands or inequitable conduct. Apart from the fact that the decision addressed the issue of validity, rather than enforceability, the Court's decision was based on its conclusion that the affidavit in question was not material because what mattered was that the method had been used to vulcanize rubber, not that it had been used to vulcanize rubber that was in turn used to make particular goods. Given that the nature of the rubber objects that the inventor vulcanized was not relevant to the issues before the Patent Office, it is not surprising that the Court found the error not to be material. In any event, the Court’s choice of language — stating that the affidavits "were not the basis for [the issuance of the patent] or essentially material to its issue,” is not restricted to a "but for” test, but suggests a broader standard for materiality.

. The PTO’s Rule 56 deals with the “duty to disclose information material to patentability” and does not explicitly address affirmative false statements to the PTO made by parties prosecuting a patent application. In some instances, as in this case, a false or misleading affirmative statement also violates the disclosure requirement, because when a party makes a statement that is inconsistent with the party’s own prior statement, the failure to disclose the prior statement constitutes a failure to disclose information that “refutes, or is inconsistent with, a position the applicant takes" in asserting patentability or opposing an argument of unpatentability relied on by the PTO. Rule 56(b)(2). An affirmative false statement that does not separately violate the disclosure rules may nonetheless be contrary to the broader "duty of candor and good faith” referred to in paragraph (a) of Rule 56, which is imposed on “each individual associated with the filing and prosecution of a patent application.” See Nilssen v. Osram Sylvania, Inc., 504 F.3d 1223, 1231-32 (Fed.Cir. 2007); Dayco Prods., 329 F.3d at 1363-64.
*1314 The majority holds that the "but for” test does not apply to "affirmative acts of egregious misconduct.” It then adds that neither "nondisclosure of prior art references to the PTO nor failure to mention prior art references in an affidavit constitutes affirmative egregious misconduct” under any circumstances. As this case illustrates, it is often difficult to draw a line between nondisclosure and affirmative misrepresentation. For example, is a submission to the PTO that purports to describe the state of the prior art but knowingly omits the closest prior art an “affirmative act” of misconduct or merely a "non-disclosure of information”? Even the Hazel-Atlas case, which the majority describes as an example of egregious misconduct, could be regarded as an instance of nondisclosure, as the problem identified by the Supreme Court was the failure to disclose that the article in question was actually written by an attorney for the patentee. The distinction between "affirmative acts” and "nondisclosure” is thus apt to become fertile ground for litigation in the future, not to mention the distinction between "egregious” misconduct and misconduct that is assertedly less than "egregious.”
Contrary to the statement in Judge O’Malley's separate opinion, nothing in this opinion rejects the application of the doctrine of inequitable conduct (or "unclean hands”) as applied to other forms of misconduct, in litigation or otherwise. This case deals with the consequences of nondisclosure in violation of the duty of disclosure imposed by the PTO's Rule 56, and this opinion is directed solely to the role of the doctrine of inequitable conduct in that context.

. The majority argues that the "but for” test is applied in both copyright and trademark law to claims of fraudulent registration. To the contrary, in the copyright context, courts have rejected the "but for” test in favor of a rule that a federal registration will be invalidated if the claimant willfully misstates or fails to state a fact that, if known, “might have occasioned a rejection of the application.” Eckes v. Card Prices Update, 736 F.2d 859, 861-62 (2d Cir.1984) (emphasis added); see generally 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 7.20[B][1], at 7-212, 4(1) & n. 21 (rev. ed. 2010) ("If the claimant wilfully misstates or fails to state a fact that, if known, might have caused the Copyright Office to reject the application, [it] may be ruled invalid.") (citing numerous cases). In 2008, Congress adopted a "but for” test to govern the effect of errors on the right to bring a civil action and the right to heightened remedies, see 17 U.S.C. § 411 (Supp. Ill 2009), but that provision was not made applicable to the presumption of copyright validity set forth in 17 U.S.C. § 410(c), which remains subject to the pre-2008 standards. See 2 Nimmer on Copyright § 7.20[B][1], at 7-212.4(2) n. 25.2.
As for trademarks, it is true that in deciding whether fraud on the PTO will result in the cancellation of a mark on the federal register, courts apply a "but for” test of materiality. See, e.g., Orient Express Trading Co. v. Federated Dep’t Stores, Inc., 842 F.2d 650, 653 (2d Cir.1988) (defining material fact as "one that would have affected the PTO’s action on the applications”); Citibank, N.A. v. Citibanc Grp., Inc., 724 F.2d 1540, 1544 (11th Cir. 1984) (requiring "false, material statement by the plaintiff of a fact that would have constituted grounds for denial of the registration had the truth been known.”). As the author *1317 of the leading treatise on trademark law has pointed out, however, cancellation of a mark from the federal register does not extinguish the trademark rights of the mark’s owner or defeat the owner’s right to sue infringers. 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 31.60 (4th ed.2008).
Unlike the effect of a trademark registration, the issuance of a patent grants a right which, but for the examination and allowance at the PTO, would not exist. For those reasons, as McCarthy has explained, the "standard of disclosure and hence of ‘fraud’ in the procurement of federal trademark registrations should be, and is, quite different from that in patent procurement. The stringent standard[s] of disclosure applicable to patent applications are ... not appropriate to applications for trademark registration.” Id. at § 31.65 (internal quotation and citation omitted).

. Understandably relying on this court's prior case law, the district court stated at one point that Mr. Pope "knew or should have known” that the withheld information would have been highly material to the examiner, and at another point the court referred to “balancing the levels of materiality and intent.” Although those remarks suggest a looser standard than that advocated here, they do not undermine the district court’s ruling on inequitable conduct, because the district court *1320 elsewhere made findings that clearly satisfied the requirements of the more restrictive standard for inequitable conduct set forth above. In particular, the court found that Mr. Pope "acted with specific intent to deceive Examiner Shay and the PTO,” that Mr. Pope and Dr. Sanghera "made a conscious and deliberate decision to withhold disclosure to the PTO of these prior statements” to the EPO, and that both of them "knew that the EPO materials made affirmative statements inconsistent with the declaration and the attorney remarks [to the PTO].” With respect to Dr. Sanghera, the court found that he "consciously made sworn statements to the [PTO] that were deliberately misleading.” With respect to the issue of "balancing,” moreover, the district judge did not find it necessary to balance intent against materiality, because he explicitly found that the evidence was strong as to both materiality and intent.